**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

SUE EVENWEL; EDWARD PFENNINGER,

               Plaintiffs,

v.

RICK PERRY, in his official capacity as
Governor of Texas; NANDITA BERRY, in her
official capacity as Texas Secretary of State,

               Defendants.

Civil Action No. 1:14-cv-335

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................. 1

II.     STATEMENT OF UNDISPUTED FACTS ................................................... 3

III.    ARGUMENT ................................................................................................... 8

        A.    Summary Judgment Standard ........................................................... 8

        B.    The Fifth Circuit's *Chen* Decision Does Not Require Dismissal. ......... 8

        C.    The Right To Equal Voting Power Is Established By The Fourteenth
              Amendment's One-Person, One-Vote Doctrine. ............................... 12

        D.    Plaintiffs Have Indisputably Been Deprived Of An Equal Voice In
              Electing The Texas State Senate. ..................................................... 15

IV.     CONCLUSION ............................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abate v. Mundt,*
    403 U.S. 182 (1971) .................................................................................................17

*Avery v. Midland County,*
    390 U.S. 474 (1968) ............................................................................................11, 15

*Baker v. Carr,*
    369 U.S. 186 (1962) ..............................................................................................3, 10

*Board of Estimate of City of New York v. Morris,*
    489 U.S. 688 (1989) ............................................................................................11, 16

*Branch v. Smith,*
    538 U.S. 254 (2003) .................................................................................................11

*Brown v. Thomson,*
    462 U.S. 835 (1983) ...................................................................................5, 11, 15, 18

*Burns v. Richardson,*
    384 U.S. 73 (1966) ..............................................................................................11, 14

*Chapman v. Meier,*
    420 U.S. 1 (1975) .....................................................................................................11

*Chen v. City of Houston,*
    121 S. Ct. 2020 (2001) ..........................................................................................3, 11

*Chen v. City of Houston,*
    206 F.3d 502 (5th Cir. 2000) ............................................................................. *passim*

*Connor v. Finch,*
    431 U.S. 407 (1977) ...................................................................................6,11, 13, 18

*Davis v. Perry,*
    No. 5:11-cv-00788-OLG-JES-XR (W.D. Tex. Mar. 9, 2012) .................................5

*Dunn v. Blumstein,*
    405 U.S. 330 (1972) .................................................................................................11

*Gaffney v. Cummings,*
    412 U.S. 735 (1973) ...........................................................................................11, 13, 15

*Garza v. County of Los Angeles*,
    918 F.2d 763 (9th Cir. 1990) ......................................................................13, 17

*Gray v. Saunders*,
    372 U.S. 368 (1963)......................................................................................10

*Hadley v. Junior College District of Metropolitan Kansas City, Missouri*,
    397 U.S. 50 (1970)...........................................................................1, 11, 14

*Kirkpatrick v. Preisler*,
    394 U.S. 526 (1969)......................................................................................16

*Kornman & Associates, Inc. v. United States*,
    527 F.3d 443 (5th Cir. 2008) ..........................................................................8

*Kostick v. Nago*,
    960 F. Supp. 2d 1074 (D. Haw. 2013), *aff'd*, 134 S. Ct. 1001 (2014)...................14

*Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Insurance Co.*,
    706 F.3d 622 (5th Cir. 2013) ..........................................................................8

*Mahan v. Howell*,
    410 U.S. 315 (1973)...............................................................................11, 15

*Reynolds v. Sims*,
    377 U.S. 533 (1964)............................................................................. *passim*

*Swann v. Adams*,
    385 U.S. 440 (1967)......................................................................................17

*United States v. Ramsey*,
    353 F.2d 650 (5th Cir. 1965) ........................................................................10

*White v. Regester*,
    412 U.S. 755 (1973)..........................................................................6, 11, 15

**MISCELLANEOUS**

42 U.S.C. § 1973*l*(e) .........................................................................................1, 18

42 U.S.C. § 1988(b), (c).....................................................................................1, 18

Fed. R. Civ. P. 56(a) ...........................................................................................8

Tex. Att'y Gen. Op. No. MW-350 (1981) ................................................................4

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Sue Evenwel and Edward Pfenninger ("Plaintiffs") respectfully move this Court for entry of an Order granting summary judgment that the Senate apportionment plan signed into law by Governor Rick Perry on June 26, 2013 ("Plan S172") unlawfully deprives Plaintiffs of their right to Equal Protection under the Fourteenth Amendment. No genuine issue of material fact arises, and Plaintiffs are entitled to judgment as a matter of law. Plaintiffs further request a declaration that Plan S172 violates the Fourteenth Amendment; a permanent injunction barring Defendants from calling, holding, supervising, or certifying any elections under Plan S172; and an order requiring Texas to establish constitutionally valid state senatorial districts prior to the next scheduled state senatorial election. Plaintiffs also seek reasonable attorney's fees and costs incurred herein under 42 U.S.C. §§ 1973*l*(e) and 1988(b) and (c).

## I.   <u>INTRODUCTION</u>

Fifty years ago, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment guarantees all electors within a State an equally weighted vote—the fundamental "one person, one vote principle." *See Reynolds v. Sims*, 377 U.S. 533 (1964). In fact, it is "the basic principle of representative government" that "the weight of a citizen's vote cannot . . . depend on where he lives." *Id*. at 567. Thus, "it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five, or 10, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable." *Id*. at 562. "[W]hen members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as . . . practicable, that equal numbers of voters can vote for proportionally equal numbers of officials." *Hadley v. Junior Coll. Dist.*, 397 U.S. 50, 56 (1970). In spite of this

mandate, the State of Texas, through the officials named as Defendants in this action, has deprived Plaintiffs of their right to an equally weighted vote.

The State of Texas adopted Plan S172 in 2013 for the election of Members of the Texas Senate.  In apportioning the 31 senatorial districts established under Plan S172, Texas focused for constitutional purposes exclusively on equalizing total district populations without considering the number of voters or potential voters within each district.  In Plan S172 districts where the number of voters is relatively low, therefore, the number of voters with the power to elect a Senate member is far fewer than the number of voters with the power to elect a Senate member in districts where the number of electors is relatively high.  Hence, the weight of a vote for those residing in a district where the number of electors is relatively high, like the districts in which Plaintiffs reside, is given significantly less weight than the weight of a vote in districts where the number of voters is relatively low.  That indisputable fact frames the legal issue presented by this case.

Plan S172 is patently unconstitutional.  While perfect equality of voting power may not be possible, a voter population maximum deviation greater than 10% from the ideally proportioned district is constitutionally suspect and must pass strict scrutiny; a deviation exceeding 20% is *per se* unconstitutional.  The maximum deviation of Plan S172, as the Supreme Court calculates that figure, is between 45%–55%, depending on which metric for voter population is utilized.  Plaintiffs reside in districts with significantly more voters than the equality ideal.  Such deviations, if not *per se* denials of Plaintiffs' Equal Protection rights, cannot pass strict scrutiny, especially when Texas could have reconciled the constitutional imperative of voting power equality and its interest in creating representational equality by drawing districts with both relatively equivalent voting and total populations.  Thus, whether representational

2

equality is deemed an important state interest, a compelling one, or even a constitutional necessity, Plan S172 is unsustainable. The representational interest cannot be advanced in complete derogation of the personal anti-dilution rights individual voters hold under the Equal Protection Clause. Texas has simply ignored the duty to reconcile the interests of voters and other residents to the maximum extent feasible and placed itself in derogation of the fundamental one-person-one vote principle mandated by the Supreme Court.

*Chen v. City of Houston*, 206 F.3d 502 (5th Cir. 2000), which held that the question whether voter population equality must replace total population equality as an exclusive districting criterion is non-justiciable, does not control this case. The *Chen* court confronted a demand for a binary choice between voting and total population equalization. But here, Plaintiffs do not ask this Court to usurp the Texas Legislature's prerogative to draw districts based on a multitude of factors, including equalizing total population. Plaintiffs ask only that Texas draw districts that protect their constitutional right to voting equality. *Chen* thus should not be extended to reach this case and, moreover, was wrongly decided. The justiciability of individual voting right claims was resolved long ago in *Baker v. Carr*, 369 U.S. 186 (1962), which squarely held that the Equal Protection rights of voters are to be given judicial recognition. Having recognized voting rights claims, federal courts have "an obligation to explain to States and localities what [the one-person one-vote principle] actually means." *Chen v. City of Houston*, 121 S. Ct. 2020, 2021 (2001) (Thomas, J., dissenting from the denial of certiorari). Summary judgment in favor of Plaintiffs should be granted.

## II.   STATEMENT OF UNDISPUTED FACTS

The one-person, one-vote principle of the Equal Protection Clause requires the States periodically to revise their apportionment schemes in order to take into account population shifts and changes throughout the State. The Supreme Court has held that decennial reapportionment

of state legislatures meets the constitutional requirement for maintaining a reasonably current scheme of legislative representation.  *See Reynolds*, 377 U.S. at 583-84.  Section 28, Article III of the Texas Constitution compatibly requires the Texas Legislature to reapportion the Texas Senate at its first regular session following the publication of the federal decennial Census. Complaint, ECF No. 1 ("Compl.") ¶ 17.  In response to the 2010 Census, the Texas Legislature undertook a Texas Senate redistricting process.  Compl. ¶ 18.

Section 25, Article III of the Texas Constitution provides that "[t]he State shall be divided into Senatorial Districts of contiguous territory, and each district shall be entitled to elect one Senator."  The Texas Constitution does not otherwise restrict districting by county, city, or other boundaries.  Compl. ¶ 19.  The Texas Constitution formerly included provisions requiring that "[t]he State shall be divided into Senatorial Districts . . . according to the number of qualified electors, as nearly as may be . . . ."  In 1981, Texas Attorney General Mark White opined that those aspects of the Texas Constitution were "unconstitutional on [their] face as inconsistent with the federal constitutional standard."  Tex. Att'y Gen. Op. No. MW-350 (1981). Those provisions of the Texas Constitution were repealed in 2001.  Compl. ¶ 20.  Attorney General White's opinion did not contain any analysis to support his conclusion.  Consistent with Opinion No. MW-350, and in the absence of any state law requiring division of senatorial districts by the number of qualified electors, the Texas Legislature redrew Texas's senatorial districts to equalize total population but did not consider equalizing the number of electors or potential electors by district.  Compl. ¶ 21.

The Texas Legislature initially created Plan S148 as a redistricting plan for the Texas Senate.   H.B. 150, a bill containing Texas's congressional, state senate, and state house redistricting plans, including Plan S148, was signed into law by Defendant Governor Rick Perry

4

on June 17, 2011.  Compl. ¶ 23.  All three redistricting plans were challenged in federal court on various grounds.  A three-judge panel of the United States District Court for the Western District of Texas found that there was a "not insubstantial claim that" Plan S148 violated Section 5 of the Voting Rights Act, *see Davis v. Perry*, No. 5:11-cv-00788-OLG-JES-XR, ECF No. 147 (W.D. Tex. Mar. 9, 2012), and the court created Plan S172 as an interim plan for the 2012 elections as a remedy.  Compl. ¶ 24.  The Texas Senate and Texas House thereafter passed a bill making Plan S172 the State's legislatively enacted plan on June 14 and June 21, 2013, respectively.  Governor Perry signed the bill on June 26, 2013.  Compl. ¶ 25.

Texas has created tables of official State data that serve as appropriate benchmarks for the number of actual or potential electors in any postulated district.  Those data include the Citizen Voting Age Population ("CVAP") from the three American Community Surveys ("ACS") conducted by the Census Bureau closest to the creation of Plan S172 in 2012, the total voter registration numbers released by Texas in 2008 and 2010, and the non-suspense voter registration numbers released by Texas in 2008 and 2010.  Compl. Ex. B–E.  Those data demonstrate that many of the districts created by Plan S172 are severely over- or under-populated with voters relative to other districts in Texas.  Compl. ¶¶ 26-27.  Set out below are the variations from the ideal district using those data.  Compl. ¶ 27.  For each data set, the "ideal" district is the total relevant population statewide, divided by 31 (the number of Senate districts).  For example, the statewide CVAP from the 2007–2011 ACS was 15,070,385, meaning that the "ideal" senate district would contain 502,632 citizens of voting age (potential electors).  *See* Exhibit D.  The percentage deviation from that ideal is then determined, as required by the Supreme Court, by summing the maximum upward and downward percentage deviations, each based on difference from the "ideal" district.  *See, e.g.*, *Brown v. Thomson*, 462 U.S. 835, 842,

846 (1983) (utilizing this formula); *Connor v. Finch*, 431 U.S. 407, 416-18 (1977) (same); *White v. Regester*, 412 U.S. 755, 761, 764 (1973) (same).

| Metric | % Deviation From Ideal |
|---|---|
| CVAP (2005-2009 ACS) (Exhibit B) | 47.87% |
| CVAP (2006-2010 ACS) (Exhibit C) | 46.77% |
| CVAP (2007-2011 ACS) (Exhibit D) | 45.95% |
| Total Voter Registration (2010) (Exhibit E) | 55.06% |
| Total Voter Registration (2008) (Exhibit E) | 51.14% |
| Non-Suspense Voter Registration (2010) (Exhibit E) | 53.66% |
| Non-Suspense Voter Registration (2008) (Exhibit E) | 51.32% |

Plaintiff Sue Evenwel is a citizen of the United States and of Texas and resides in Titus County, Texas. She is a registered voter residing within the geographic boundaries of Senate District 1 under Plan S172. She regularly votes in Texas Senate elections, and plans to do so in the future. Compl. ¶ 6. Plaintiff Edward Pfenninger is a citizen of the United States and of Texas and resides in Montgomery County, Texas. He is a registered voter residing within the geographic boundaries of Senate District 4 under Plan S172. He regularly votes in Texas Senate elections, and plans to do so in the future. Compl. ¶ 7. Plaintiffs live in Senate districts that are among the most overpopulated with electors under Plan S172. Compl. ¶¶ 29-30.

The tables below compare the number of electors (or potential electors) in Senate District 1 and 4, respectively, to the Senate District with the lowest number of electors (or potential electors), expressed as a percentage deviation from the ideal district and as a ratio of relative voting strength.

**SENATE DISTRICT 1**

| Metric | Senate District 1 | Low Senate District | Absolute Difference | % Deviation From Ideal | Voting Power |
|---|---|---|---|---|---|
| CVAP (2005-2009 ACS) (Exhibit B) | 557,525 | 358,205 | 199,320 | 41.49% | 1:1.56 |
| CVAP (2006-2010 ACS) (Exhibit C) | 568,780 | 367,345 | 201,435 | 40.88% | 1:1.55 |
| CVAP (2007-2011 ACS) (Exhibit D) | 573,895 | 372,420 | 201,475 | 40.08% | 1:1.54 |
| Total Voter Registration (2010) (Exhibit E) | 489,990 | 290,230 | 199,760 | 46.69% | 1:1.69 |
| Total Voter Registration (2008) (Exhibit E) | 513,259 | 297,692 | 215,567 | 49.23% | 1:1.72 |
| Non-Suspense Voter Registration (2010) (Exhibit E) | 425,248 | 252,087 | 173,161 | 47.23% | 1:1.69 |
| Non-Suspense Voter Registration (2008) (Exhibit E) | 437,044 | 256,879 | 180,165 | 47.76% | 1:1.84 |

**SENATE DISTRICT 4**

| Metric | Senate District 4 | Low Senate District | Absolute Difference | % Deviation From Ideal | Voting Power |
|---|---|---|---|---|---|
| CVAP (2005-2009 ACS) (Exhibit B) | 506,235 | 358,205 | 148,030 | 30.81% | 1:1.41 |
| CVAP (2006-2010 ACS) (Exhibit C) | 521,980 | 367,345 | 154,635 | 31.38% | 1:1.42 |
| CVAP (2007-2011 ACS) (Exhibit D) | 533,010 | 372,420 | 160,590 | 31.95% | 1:1.43 |
| Total Voter Registration (2010) (Exhibit E) | 466,066 | 290,230 | 175,836 | 41.10% | 1:1.61 |
| Total Voter Registration (2008) (Exhibit E) | 468,949 | 297,692 | 171,257 | 39.11% | 1:1.58 |
| Non-Suspense Voter Registration (2010) (Exhibit E) | 406,880 | 252,087 | 154,793 | 42.22% | 1:1.61 |
| Non-Suspense Voter Registration (2008) (Exhibit E) | 409,923 | 256,879 | 153,044 | 40.57% | 1:1.60 |

In sum, there are electors in the State of Texas whose votes weigh approximately one and one-half times Plaintiffs' votes.  Compl. ¶¶ 29-31.

## III.   ARGUMENT

This case raises a purely legal issue: whether Texas was required to recognize and protect the interest of voting equality in apportioning its State senatorial districts.  That issue is ripe for determination.  No binding precedent precludes recognition of the principle that Texas must respect and enforce electors' right to an equally weighted vote; indeed, Supreme Court precedent requires that Texas do so.  Because Texas did not, Plaintiffs are entitled to judgment as a matter of law under Rule 56.

### A.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party.  A fact issue is 'material' if its resolution could affect the outcome of the action."  *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 628 (5th Cir. 2013) (citation and quotations omitted).  "Summary judgment is appropriate where the only issue before the court is a pure question of law."  *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 450 (5th Cir. 2008) (citations and internal quotations omitted).

### B.   The Fifth Circuit's *Chen* Decision Does Not Require Dismissal.

In *Chen v. City of Houston*, 206 F.3d 502 (5th Cir. 2000), the Fifth Circuit rejected an argument that the City of Houston was "required by the Equal Protection Clause to use CVAP rather than total population in crafting its [city council] districts."  *Id.* at 523.  The Fifth Circuit instead held that "the choice of population figures is a choice left to the political process."  *Id.*  In

the court's view, "[t]he propriety under the Equal Protection Clause of using total population rather than a measure of potential voters . . . presents a close question. But in face of the lack of more definitive guidance from the Supreme Court, we conclude that this eminently political question has been left to the political process" and thus is non-justiciable. *Id.* at 528. For at least two reasons, however, *Chen* does not dictate the outcome of this dispute.

First, *Chen* decided a legal issue different from the one presented here. In *Chen*, as noted above, the Fifth Circuit was confronted with an argument that the Fourteenth Amendment required Houston "to use CVAP *rather than* total population" in designing city council districts. 206 F.3d at 523 (emphasis added); *see also id.* at 528 (describing the plaintiffs' legal claim as an objection to "using total population *rather than* a measure of potential voters" (emphasis added)). Here, in contrast, Plaintiffs do not ask this Court to enjoin Texas from considering total population in apportioning Senate districts. Compl. ¶ 34. Rather, they seek a declaration that Texas cannot ignore voter population and form districts based exclusively on total population when, as is the case here, doing so deprives voters their constitutional right under the Equal Protection Clause to an equally weighted vote. *See infra* at 15-18.

Furthermore, Plaintiffs do not ask this Court to invade the "political process" and usurp Texas's prerogative to draw Senate districts based on many factors the legislature may appropriately take into consideration, including seeking to minimize differences in total population amongst districts. Plaintiffs instead seek an order that more modestly recognizes the Texas Legislature's duty to engage in an apportionment process that takes into account the constitutional equal voting rights of its citizens, which the State has ignored since at least 1981. Put simply, Texas should not be permitted to base apportionment on voter population alone; it

must fairly balance all relevant factors within constitutional limits.  *See infra* at 10.  Accordingly, both the legal claim and relief sought make this case distinguishable from *Chen*.[1]

Second, the Court should not extend *Chen* beyond its facts because it was wrongly decided.  The Supreme Court settled the political-question issue in favor of justiciability more than 50 years ago.  In *Baker v. Carr*, which was the first case to find a vote dilution challenge to a legislative apportionment claim justiciable under the Fourteenth Amendment, the Supreme Court found that the plaintiffs had standing as "*voters* of the State of Tennessee" and that "*voters* who allege facts showing disadvantage to themselves as individuals have standing to sue."  369 U.S. 186, 204, 206 (1962) (emphasis added).  On that basis, the Supreme Court held that the Tennessee voters' apportionment challenge was "justiciable, and if discrimination is sufficiently shown, the right to relief under the equal protection clause is not diminished by the fact that the discrimination relates to political rights."  *Id*. at 209-10.  In other words, it was the plaintiffs' status as *voters* that afforded them Article III standing and it was their right to an undiluted *vote* under the Fourteenth Amendment that made that claim justiciable.  *See Gray v. Saunders*, 372 U.S. 368, 375 & n.7 (1963).  Absent those features, there is no reason to believe that the Supreme Court would have declared a judicially enforceable one-person, one-vote right in the first place.

---

[1]    *Chen* also is not binding precedent because this case is not before the Fifth Circuit; it is before a three-judge district court specially constituted under 28 U.S.C. § 2284(a).  Texas has taken the position in an analogous context that circuit precedent does not bind such three-judge district court panels because only the Supreme Court has the authority to review a three-judge court's decisions.  *See* Plaintiff's Motion for Summary Judgment 38-40, ECF No. 347, *Texas v. Holder*, No. 12-cv-128 (D.D.C. Oct. 1, 2012) ("Texas contends that this three-judge district court is bound to follow only the precedent of the Supreme Court of the United States." (citing *United States v. Ramsey*, 353 F.2d 650, 658 (5th Cir. 1965))).  Were the Court to agree with Texas's interpretation of the judicial hierarchy under Section 2248, *Chen* would not be controlling precedent and this Court would be required to address the constitutional issue on the merits.

Two years later, *Reynolds v. Sims*, 377 U.S. 533 (1964), the Court confirmed this understanding by squarely rejecting the very reasoning *Chen* employed:

> We are told that the matter of apportioning representation in a state legislature is a complex and many-faceted one. We are advised that States can rationally consider factors other than population in apportioning legislative representation. We are admonished not to restrict the power of the States to impose differing views as to political philosophy on their citizens. We are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us.

*Id.* at 566.

Accordingly, "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized" by this Court. *Id.* at 562. Indeed, the many Supreme Court decisions examining whether an apportionment plan utilized the appropriate population base for one-person, one-vote purposes were wrongly decided if, as *Chen* found, that issue is committed to the political process and is therefore unreviewable. *See, e.g.*, *Burns v. Richardson*, 384 U.S. 73 (1966); *Avery v. Midland County*, 390 U.S. 474 (1968); *Hadley*, 397 U.S. 50; *Dunn v. Blumstein*, 405 U.S. 330 (1972); *Gaffney v. Cummings*, 412 U.S. 735 (1973); *Mahan v. Howell*, 410 U.S. 315 (1973); *White*, 412 U.S. 755; *Chapman v. Meier*, 420 U.S. 1 (1975); *Brown*, 462 U.S. 835; *Connor*, 421 U.S. 407; *Bd. of Estimate v. Morris*, 489 U.S. 688, 698 (1989). These cases reaffirm that the overall principle is not a political question and further demonstrate that justiciability is not undermined by the fact that the legal issue here involves a particular application of the one-person, one-vote doctrine. Having "crossed the Rubicon," *Branch v. Smith*, 538 U.S. 254, 278 (2003), there is no justifiable basis for retreating to the political-question doctrine when subsidiary issues need to be resolved to determine whether voters' rights have been infringed. *See generally Chen*, 121 S. Ct. at 2021 (Thomas, J., dissenting in the denial of certiorari).

### C.   The Right To Equal Voting Power Is Established By The Fourteenth Amendment's One-Person, One-Vote Doctrine.

Texas has taken the position the United States Constitution requires the state legislature to apportion Senate districts based on equalizing total population even if that framework produces districts grossly malapportioned with regard to electors or potential electors. Compl. ¶¶ 20-21. That is incorrect. The Equal Protection Clause protects "the right of all qualified citizens to vote." *Reynolds*, 377 U.S. at 554. Because the right "guarantees the opportunity for equal participation by all voters in the election of state legislators," *id.* at 566, "the weight of a citizen's vote cannot be made to depend on where he lives," *id.* at 567.

The fundamental premise of the Fourteenth Amendment's one-person, one-vote doctrine therefore is that "all who participate in [an] election are to have an equal *vote*—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographic unit." *Id.* at 557-58 (emphasis added); *see also id.* at 561 ("[T]he judicial focus must be concentrated upon ascertaining whether there has been any discrimination against certain of the State's citizens which constitutes an impermissible impairment of their constitutionally protected right to vote."). "Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living [in] other parts of the State." *Id.* at 568. *Reynolds* could not have been clearer: the one person, one vote doctrine principally secures the rights of voters to an undiluted vote.

In many cases, using total population as the exclusive numerical determinant for apportionment will sufficiently protect the Fourteenth Amendment rights of voters because "eligible voters will frequently track the total population evenly." *Chen*, 206 F.3d at 525. But that will not always be true. Where, as in Texas, large numbers of persons ineligible to vote

12

swell the population of certain geographic locations, the exclusive use of a total population metric inevitably will fail to protect the individual right to cast an equally weighted vote. *See infra* at 15-16.

Population or representational equality is not and has never been elevated over voting equality. No decision from the Supreme Court has ever expressed that equalizing total population will suffice to protect the constitutional rights of voters under all circumstances. Rather, the use of total population in redistricting has always been understood as one means of effectively protecting electors from having their votes diluted in the districting process. "[T]he overriding objective must be substantial equality of population among the various districts, *so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State*." *Reynolds*, 377 U.S. at 579 (emphasis added); *Connor*, 421 U.S. at 416 ("The Equal Protection Clause requires that legislative districts be of nearly equal population, *so that each person's vote may be given equal weight in the election of representatives*." (emphasis added)). When total population significantly departs from voting population, other data must be incorporated into the legislature's decision-making process to ensure the equal-protection rights of voters are not infringed. *See Gaffney*, 412 U.S. at 746 (recognizing "total population . . . may not actually reflect that body of voters whose votes must be counted and weighed for the purposes of reapportionment, because 'census persons' are not voters"); *see also Garza v. County of Los Angeles*, 918 F.2d 763, 783 (9th Cir. 1990) (Kozinski, J., dissenting) ("[A] careful reading of the [Supreme] Court's opinions suggests that equalizing total population is viewed not as an end in itself, but as a means of achieving electoral equality.").

Indeed, the Supreme Court has been presented with the mirror-image question—*i.e.*, whether redistricting based on voter statistics only is constitutionally objectionable—and the

Court has found that it is not. *See, e.g.*, *Burns*, 384 U.S. 73; *Kostick v. Nago*, 960 F. Supp. 2d 1074 (D. Haw. 2013), *aff'd*, 134 S. Ct. 1001 (2014). In *Burns*, the Island of Oahu, Hawaii contained a large population of military personnel and other transients who were counted in the Census but were not registered to vote in Hawaii. *Burns*, 384 U.S. at 90-91. Hawaii decided to redistrict based on voter registration statistics rather than total population, and the resulting redistricting plan assigned 37 of 51 state house seats to Oahu based on voter registration. Had redistricting been based on total (Census) population, Oahu would have been entitled to three additional seats. *See id*. at 90. While the plan created deviations between districts of over 100% with respect to total population (*e.g.*, certain districts contained twice as many residents as others), the districts had only minor deviations in their numbers of registered voters. *See id*. at 90-91 & n.18. The Supreme Court upheld Hawaii's decision to rely on voter population to apportion districts against an Equal Protection challenge. *See id*. at 93. The Court found that using total population, in light of the high concentration of non-voters on Oahu, would have been "grossly absurd and disastrous." *Id*. at 94.

The guiding principle therefore cannot be the one that underlies Texas's decision to adopt Plan S172—*i.e.*, that the use of total population alone is constitutionally mandatory. Had the Fourteenth Amendment demanded exclusive reliance on total population in apportioning districts, as the Texas Legislature was led to believe, *Burns* would have come out the other way. It did not because the one-person, one-vote doctrine fundamentally protects the rights of *voters*. That is why "when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as practicable, that equal numbers of *voters* can *vote* for proportionally equal numbers of officials." *Hadley*, 397 U.S. at 56 (emphasis added).

14

D.     **Plaintiffs Have Indisputably Been Deprived Of An Equal Voice In Electing The Texas State Senate.**

The Equal Protection Clause does not require that the relevant population of each district be absolutely equal.  *See Brown*, 462 U.S. at 842.  But it does forbid "substantial variation" from the constitutional requirement of equal voting power.  *Avery*, 390 U.S. at 485.  Under governing precedent, a relevant population difference between the largest and smallest districts of 10% or more is *prima facie* evidence of a one-person, one-vote violation that triggers the government's obligation to establish a compelling justification for the deviation.  *Brown*, 462 U.S. at 852; *White*, 412 U.S. at 763; *Mahan*, 410 U.S. at 329; *Gaffney*, 412 U.S. at 750-51.  And, a large enough difference can be *per se* unconstitutional.  *Mahan*, 410 U.S. at 329.

Plan S172 is *per se* unconstitutional.  The Supreme Court has made clear that a 16.4% deviation "may well approach tolerable limits" under the Equal Protection Clause, regardless of justification.  *Id.*  The deviations here are double or triple those examined in *Mahan*.  Based on Texas's own data, the deviation from the ideal district in District 1 is anywhere from 40.08% to 49.23% under the various available metrics for calculating voter population.  Compl. ¶ 29.  For District 4, the deviation from the ideal district is anywhere from 30.81% to 42.22% based on those same figures.  Compl. ¶ 30.  As *Reynolds* explained, such massive disparities in voter population between Senate districts are patently unconstitutional:

> [I]f a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted.  It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voters could vote two, five, or 10 times for their legislative representatives, while voters living elsewhere could vote only once.  And it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five, or 10, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable.

377 U.S. at 562; *see also Morris*, 489 U.S. at 698 ("[A] citizen is . . . shortchanged if . . . he may vote for one representative and the voters of another district half the size also elect one representative.").   If the one-person, one-vote doctrine has any force, the voting power differences at issue here must be deemed *per se* unconstitutional.

But even if the Plan S172 is not *per se* unconstitutional, Texas has no compelling state interest in creating Senate districts with voter disparities this great.   As an initial matter, the Texas Legislature did not even "make a good-faith effort" to apportion Senate districts with roughly equal numbers of voters.  *See Kirkpatrick v. Preisler*, 394 U.S. 526, 530-31 (1969). Rather, it labored under the mistaken legal impression that the Fourteenth Amendment required it to ignore voter population and focus exclusively on total population.  Compl. ¶¶ 20-21.  That misapprehension alone renders Plan S172 indefensible.   Texas cannot have properly exercised any discretion it might hold constitutionally to favor other redistricting criteria over equalizing voter population when the Attorney General had instructed the state legislature that it lacked any legal authority to consider voters' rights.   Texas's failure even to consider voter population makes it impossible for it to pass strict scrutiny.

Regardless, Texas could not defend disparities this large even if it had considered (and then rejected) equalization of voter population.  To be sure, Texas is entitled to take factors other than the one-person, one-vote doctrine into consideration when it engages in apportionment. That is, Texas is not required to maximize the constitutional interest of voters in an undiluted vote and ignore all other interests that the legislature might legitimately deem important.  The Supreme Court has explained, for example, that preservation of the integrity of political subdivisions and maintenance of compactness and contiguity are two such legitimate interests.

*See Abate v. Mundt*, 403 U.S. 182, 185 (1971); *Swann v. Adams*, 385 U.S. 440, 444 (1967); *Reynolds*, 377 U.S. at 578-79.

It might well be that representational equality—protecting the interest of all in having an equal opportunity to access the representative from the district in which they reside—is another such interest.  *See Chen*, 206 F.3d at 524-26; *Garza*, 918 F.2d at 781-82 (Kozinski, J., dissenting).  Even so, Texas cannot elevate those interests above the fundamental protection the Equal Protection Clause affords to voters, and certainly not to such a lopsided extent.  The interest of a state like Texas in representational equality regardless of voting eligibility, might be argued to permit voting populations deviations greater than the 10% generally permissible under the Equal Protection Clause.  *See Reynolds*, 377 U.S. at 578 ("What is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case.").  But that interest, no matter how important, cannot provide a constitutional justification for Plan S172's gross malapportionment of voters.

Finally, Texas cannot survive strict scrutiny even assuming that total population equality is an interest of constitutional significance.  Whatever else may come within the Fourteenth Amendment's ambit, the Supreme Court's decisions are clear that the Equal Protection Clause protects the rights of electors against dilution, and that the legislature's redistricting responsibility does not stop with total population equalization.  *See supra* at 12-15.  Texas therefore must ensure that its apportionment of Senate districts protects the rights of electors to have their votes weigh equally, and it cannot apportion based solely on total population where, as here, doing so results in massively unequal weighting of individual electoral power.  Even assuming that the Fourteenth Amendment protects both equal voting power and equal political access, Texas must approach apportionment in a way that reconciles both interests to the

maximum extent feasible.  Texas certainly cannot, as it did in Plan S172, advance one interest in complete derogation of another.

Indeed, Texas has available databases and tools that would enable it to protect the interests of voters without foregoing consideration of representational equality.  "Using standard GIS software, one can readily adjust the boundaries of the districts in Plan S172 to create numerous alternatives to Plan S172."  Declaration of Peter A. Morrison, Ph.D. ¶ 7 (Exhibit A).  As a mathematical matter, "it is possible to devise a number of feasible alternative 31-district plans with different combinations of total population and CVAP deviations," *id.*, including at least one plan "that eliminate[s] the gross deviations in CVAP without significantly exceeding the 8.04% total population deviation from the ideal in Plan S172," *id.* ¶ 9.  At base, "there are many feasible ways to eliminate gross deviations in CVAP without causing significantly larger deviations in total population," *id.* ¶ 11, and Texas retains substantial flexibility (as it should) to adopt a Senate apportionment plan that best suits the needs of its citizens, *see Brown*, 462 U.S. at 848 (O'Connor, J. concurring).  That flexibility, however, must be exercised with respect to the interests protected by the Fourteenth Amendment.  And there can be no question that, by failing to draw Senate districts equalizing voter population to the maximum extent feasible, Plan S172 transgressed constitutional limits.

## IV.   CONCLUSION

Plaintiffs respectfully request that the Court grant this Motion.  Plaintiffs further request that the Court: declare that Plan S172 violates the Fourteenth Amendment; permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under Plan S172; enter an order requiring Texas to establish constitutionally valid state senatorial districts prior to the next scheduled state senatorial election; and award Plaintiffs all reasonable attorney's fees and costs incurred herein under 42 U.S.C. §§ 1973*l*(e) and 1988(b) and (c).

DATED:  May 12, 2014                    Respectfully submitted,

                                        /s/ Meredith B. Parenti
                                        Meredith B. Parenti
                                        Texas Bar No. 00797202
                                        PARENTI LAW PLLC
                                        P.O. Box 19152
                                        Houston, TX 77224
                                        Tel.: (281) 224-5848
                                        Fax: (281) 605-5677
                                        meredith@parentilaw.com

                                        Bert W. Rein
                                        William S. Consovoy (pro hac vice)
                                        Brendan J. Morrissey (pro hac vice)
                                        WILEY REIN LLP
                                        1776 K Street, NW
                                        Washington, DC  20006
                                        Tel.: (202) 719-7000
                                        Fax: (202) 719-7049

                                        **ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of May, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and I hereby certify that I have mailed by United States Postal Service certified mail return receipt requested the document to the following non-CM/ECF participants:

Erika Kane
General Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548
***Counsel for Defendants Rick Perry and Nandita Berry***

*/s/ Meredith B. Parenti*